FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 23 2013 ★

BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| TREMAINE JOHNSON,<br><br>        Plaintiff,<br><br>vs.<br><br>LONG ISLAND UNIVERSITY,<br><br>        Defendant. | **COMPLAINT**<br><br>Index No.: **CV 13    2464**<br><br>BROWN, M.J. |

Plaintiff Tremaine Johnson, by his attorneys Preston & Wilkins, PLLC, complaining of the Defendant's avers and says:

## JURISDICTION AND VENUE

1.    Plaintiff invokes the jurisdiction of this Court pursuant to 28 U.S.C. sections 1331 and 1343; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. Section 2000e *et seq.*; and the Civil Rights Act of 1866, 42 U.S.C. 1981. Plaintiff invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. section 1367. This action is brought pursuant to New York State Human Rights Law, Article 15, of the New York Executive Law ("N.Y. Human Rights Law")and Title 8 of the Administrative Code of the City of New York, New York City Human Rights Law ("NYC Human Rights Law").

2.    The unlawful employment practices alleged in this Complaint were in Nassau County in the Eastern District of New York.

## PARTIES

3.    Plaintiff Tremaine Johnson ("T. Johnson") is a male African American citizen of the United States of America and a resident of 487 Carlton Ave., Brooklyn, New York 11238.

4.    Defendant Long Island University ("LIU") is a private University and has an office/campus at 720 Northern Blvd., Greenvale, New York 11548.

5.    Plaintiff is informed and believes, and therefore avers, that Defendant is an employer within the meaning of Title VII, NYC Human Rights Law; and the NY Human Rights Law and has more than fifty (50) employees.

## ADMINISTRATIVE PROCEDURES

6.    Plaintiff timely filed a charge of discrimination against the Defendant with the New York District Office of the Equal Employment Opportunity Commission ("EEOC").

7.    On or about January 29, 2013, Plaintiff received from the EEOC a Notice of Right to Sue within 90 Days.

8.    Plaintiff has satisfied all private, administrative and judicial prerequisites to the institution of this action.

## FACTUAL ALLEGATIONS

9.    In the fall of 2012, Mr. Johnson applied for the Assistant Director of Residence Life position and the Resident Hall Director position with Defendant long Island University.

10.   Mr. Johnson was interviewed and hired for the Resident Hall Director position.

11.   Mr. Johnson, however was not even interviewed for the Assistant Director position, despite his qualifications.  At the time of his application, Mr. Johnson had five (5) years of experience in higher education in the Residence Life Department.  Mr. Johnson served three (3) years at Delaware State University as a Resident Assistant and 2 years at St. Johns as a Graduate Assistant.

12.   Upon information and belief, the Assistant Director of Residence Life position was given to Shaun Lazarus who only applied for the Resident Hall Director position.  Upon information and belief, Shaun Lazarus did not meet the requirements of experience for the director position and did not have as much experience as Mr. Johnson in the Residence Life Department.

13.   Throughout Mr. Johnson's tenure at LIU, Mr. Johnson asked for special projects and trainings to advance himself within the position.  Mr. Johnson was never given the opportunity to help with any administrative duties. Similarly situated employees, however were given special projects and training.

14.   Mr. Johnson was also subjected to disparate treatment.

15.   In June 2011, Jennifer Fuoco's, Associate Director of Residence Life told Mr. Johnson that he was not allowed to wear shorts, jeans, or sneakers while working.  Ms. Fuoco advised Mr. Johnson that the dress code was the standard school year attire -- slacks, collared shirt and dress shoes.

16.   Days later Mr. Johnson walked into Ms. Fuoco's office and she was wearing capris. Mr. Johnson asked if that meant he could at least wear Khaki shorts. She replied, no.  Ms.

Fuoco advised Mr. Johnson that she was able to wear capris pants, and dressing in cool temperature attire was a women thing.

17.   In July 2011, Yuri Gulzman came to a mandatory Resident Assistant training session to teach a course in shorts and sneakers, while others like Mr. Johnson was dressed in business casual attire.

18.   Throughout the summer of 2011, Dan Ugenti wore shorts and sneakers during his scheduled office hours when it was communicated to Mr. Johnson that the dress code even during the summer was the standard attire of slacks, collared shirt, and dress shoes.

19.   In September 2011, Mr. Johnson asked Ms. Fuoco about working with the athletic department. Ms. Fuoco stated that Mr. Johnson "was not allowed to work with the athletic teams during the scheduled work hours, which are from 9 to 5, and not allowed to receive any compensation for working with another department on campus." Similarly situated employees who are not in a protected class however were not also restricted. During the spring semester of 2012, Kelly Carpino interned for a non-student affair related organization 2 to 3 times a week. This commitment required Kelly Carpino to leave at 1 p.m., and was not required to make up the lost time.

20.   During the fall 2012 semester, Sean Lazarus and Daniel Ugenti taught College 101 courses during the middle of the day for compensation.  During the spring of 2012, Shana Eustacy, the only other African American staff member, advised Mr. Johnson that Ms. Fuoco stated to Ms. Eustacy that she was only allowed to take continuous education courses outside of her office hours.

21.   During the fall 2012 semester, Mr. Johnson was told by Ms. Fuoco that he had to make up anytime out of the office. Mr. Johnson had been out of the office due to a work related injury.

22.   During the spring of 2012, Mr. Johnson was injured during the Student- Staff Basketball the Game. The injury put Mr. Johnson out of work for 5 months on Workers Compensation.  When he returned back to work in September 2012, Mr. Johnson had a meeting with his colleagues in regards to creating a fall semester duty schedule.

23.   Mr. Johnson was advised  that he would have to take seven (7) weeks of duty during the fall semester, because of his absence when no other Residence Hall Directors had to take more than 2 weeks.

24.    The Associate Director, Jennifer Fuoco overheard the conversation and escorted Mr. Johnson to the Director of Residence Life, Carlyle Hicks office. Mr. Hicks confirmed that Mr. Johnson would be required to make up all of the time he missed while on Workers Compensation.

25.   While on Workers Compensation, the LIU Human Resources department explained to

Liberty Mutual (the Workers Compensation Company) that Mr. Johnson could return to work on light duty and his live in apartment would be changed to accommodate his injuries. Mr. Johnson's doctor stated, that he should not carry anything over 10 pounds and should limit the amount of steps he walks. Mr. Carlyle Hicks was persistent that Mr. Johnson make up the duty anyway, even with the doctor's orders.

26.   After Mr. Johnson followed up with his doctor he met with Jennifer Fuoco and explained that his injuries had gotten worse due to the transition with therapy and he reiterated the unfairness of the duty schedule.

27.   Ms. Fuoco stated that she had spoken with a Human Resources representative on campus and was told if Mr. Johnson was unable to do duty, then he could not keep his position. Ms. Fuoco advised that the Residence Life Department does not have a policy of light duty work. For the month of December, Mr. Johnson was required to work twenty-one (21) days straight.

28.   During the 2012, Homecoming Celebration, Mr. Johnson was required to walk around for five (5) hours around the campus. Mr. Johnson expressed to Ms. Fuoco that he was having severe body aches on two occasions throughout the day. Mr. Johnson was still required to do rounds around the campus with the staff. The very next day Mr. Johnson was not able to move out of my bed.

29.   During the week of Halloween 2012, Mr. Johnson expressed the fact that he was not able to take medication because he was on duty. Mr. Johnson was experiencing extreme body pain and could not sleep, but was still required to be on duty.

30.   While Carlyle Hicks was the Director of Residence Life, he was required to take all calls by the Hall Director on duty for all Incidents. On Nov 1st an incident occurred in Riggs Hall and numerous school officials attempted to contact Ms. Fuoco on her cell phone and home phone, but she did not respond. The next morning she stated she took medication and was in a deep sleep causing her not to hear the phone. It was expressed to all Residence Hall Directors that if they cannot be reached on duty their job would be in jeopardy.

31.   When Mr. Johnson returned to campus in September 2012, he was given an evaluation by the Central Office Staff. Mr. Johnson was told in the area of student life involvement that he needed improvement. Ms. Fuoco has often referred to Mr. Johnson as a schmoozer because he interacted with the other departments on a regular basis. Mr. Johnson was told that he needed to focus more on administrative duties than schmoozing with other departments.

32.   Mr. Johnson was given an average for professional etiquette on his evaluation. This is the same score that was given to Dan Ugenti.

33.   In a Residence Hall Directors' meeting on November 2, 2012, Mr. Johnson asked Ms.

-4-

Fuoco if he could give his staff an electronic agenda for the November 4, 2012 hall staff meeting. Mr. Johnson asked because various members of his staff expressed that they wanted to leave campus to vote and would not make it back for the 9 PM meeting. Mr. Johnson also wanted to leave after work and go vote in Brooklyn. Mr. Johnson was unable to vote in fear of losing his job.

34.    Mr. Johnson left campus at 2 pm to make an attempt to vote and was required to take a half day of work. His co-workers Scott Towers and Dan Caccavale left the campus at 12 and did not return until after 5 and neither was required to take a half day.

35.    During the fall 2012 semester, Mr. Johnson spoke with athletic Director Brian Collins and Mathew Greco about doing volunteer hours with the athletic department for the purpose of gaining experience. Mr. Johnson was told by both officials that they would contact him to arrange times and events at which he could help staff. Mr. Johnson followed up on numerous occasions with both officials but neither would return his emails or phone calls.

36.    During the fall of 2011, two Residence Hall Directors quit their positions. The department was looking to fill the open Residence Hall Director positions. A nationwide search was conducted and interviews occurred. A former employee applied for the open position who was two years removed from the undergraduate school.

37.    The current hall director staff was told by Ms. Fuoco that she would not be given the position because the candidate had not been away from her RA position for a long time and she did not fit the criteria.

38.    In the summer of 2012, two Residence Hall Directors were hired without a national search being conducted and the same interview process that was extended to previous Residence Hall Director candidates. Both were previously Residence Assistant's a month prior to being given the Residence Hall Director positions.

39.    In the fall of 2011, there was speculation that Uri Glazman a Residence Hall Director was having inappropriate relations with a current student. One of which was a member of Mr. Johnson's staff. Mr. Johnson was called into a meeting with Ms. Fuoco, where he was accused of having knowledge of said relationships and told that he may be disciplined for not being forth coming with information.

40.    Ms. Fuoco specifically stated to Mr. Johnson that as a Residence Hall Director that they are not allowed to have personal relationships with students.

41.    During the summer of 2012, Dan Cacavalli was hired for the position of Residence Hall Director.   Mr. Cacavalli has a known relationship with a current student.

42.    Disparate treatment was not limited to the Residence Life Department. Various minority athletes expressed to Mr. Johnson their discomfort with the team because of racism and

favoritism on the team, Various white athletes where give full scholarships even though they were not expected to play, Minority players received harsh punishments for incidents on campus and often where kicked off teams and had scholarships removed when white students were given multiple chances after violating school policies.

43.   Often times Public Safety would stereotype and single out minority student (Dominique Moody and Orayne McEachron) when there were white students that caused the same problems on campus.

## FIRST CAUSE OF ACTION

44.   Plaintiff repeats and realleges the averments of paragraph 1-43 herein.

45.   Plaintiff is informed and believes, and therefore avers that other employees, who were not members of the protected class were not subjected to disparate treatment.

46.   By reason of the foregoing, Defendant has deprived Plaintiff certain benefits, privileges, terms and conditions of employment, in violation of Title VII, the Civil Rights Act, the NY Human Rights Law and NYC Human Rights Law by discriminating against Plaintiff and subjecting him to discriminatory treatment because of his race.

47.   As a result of Defendant's actions, Plaintiff suffered humiliation and emotional distress.

48.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and injury.

## SECOND CAUSE OF ACTION

49.   Plaintiff repeats and realleges the averments of paragraph 1-48 herein.

50.   Plaintiff was subject to discriminatory harassment and a hostile work environment due to his race.

51.   By reason of the foregoing, Defendant has deprived Plaintiff certain benefits, privileges, terms and conditions of employment, in violation of the Title VII, the Civil Rights Act, the NY Human Rights Law and NYC Human Rights Law by subjecting Plaintiff to discriminatory treatment, harassment and a hostile work environment due to his race.

52.   As a result of Defendant's actions, Plaintiff suffered humiliation and emotional distress.

53.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and injury.

## THIRD CAUSE OF ACTION

54.   Plaintiff repeats and realleges the averments of paragraph 1-53 herein.

55.   Plaintiff is informed and believes, and therefore avers that other employees, who were not members of the protected class were not subjected to disparate treatment.

56.   By reason of the foregoing, Defendant has deprived Plaintiff Price certain benefits, privileges, terms and conditions of employment, in violation of Title VII, the Civil Rights Act, the NY Human Rights Law and NYC Human Rights Law by discriminating against Plaintiff and subjecting him to discriminatory treatment because of his gender.

57.   As a result of Defendant's actions, Plaintiff suffered humiliation and emotional distress.

58.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and injury.

## FOURTH CAUSE OF ACTION

59.   Plaintiff Price repeats and realleges the averments of paragraph 1-58 herein.

60.   Plaintiff was subject to discriminatory harassment and a hostile work environment due to his gender.

61.   By reason of the foregoing, Defendant has deprived Plaintiff certain benefits, privileges, terms and conditions of employment, in violation of the Title VII, the Civil Rights Act,  the NY Human Rights Law and NYC Human Rights Law by subjecting  Plaintiff to discriminatory treatment, harassment and a hostile work environment due to his gender.

62.   As a result of Defendant's actions, Plaintiff suffered humiliation and emotional distress.

63.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and injury.

64.   By reason of the foregoing, Plaintiff has suffered and will continue to suffer irreparable harm and injury.

**WHEREFORE**, the Plaintiff prays the Court that:

1. Plaintiff recover compensatory, consequential and punitive damages from the Defendant;

2. Plaintiff recover from the Defendant the reasonable costs of attorney's fees incurred in the prosecution of this action;

3. All issues herein be determined by a jury;

4. The Court grant such other and further relief to which it deems Plaintiff justly entitled.

Dated: April 23, 2013

Gregory R. Preston (GP6138)
Preston & Wilkins LLC
3000 Hempstead Tpke., Suite 317
Levittown, New York  11756
212-809-5808

-8-